UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBB EVANS & ASSOCIATES LLC, | ) | |
| as Receiver over the assets of John Puccio | ) | |
| and Richard Puccio, and as Receiver over | ) | |
| Cambridge Credit Corp., Brighton Credit | ) | |
| Corp., Cambridge Brighton Budget Planning | ) | |
| Corp., Brighton Credit Management Corp., | ) | |
| Brighton Credit Corp. of Massachusetts, | ) | |
| Brighton Debt Management Services, Ltd., | ) | |
| Debt Relief Clearinghouse, Ltd., Cypress | ) | |
| Advertising and Promotion, Inc., First | ) | |
| Consumers Credit Management Corp., | ) | |
| Southfork Asset Management Corp., | ) | |
| Cambridge Credit Counseling Corp., Enfield | ) | |
| Realty Corp., RJP Realty Co., Inc., and | ) | |
| Cambridge Consumer Credit Index, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-30130-MAP |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant | ) | |

REPORT AND RECOMMENDATION WITH REGARD
TO DEFENDANT'S MOTION TO DISMISS AND/OR FOR
JUDGMENT ON THE PLEADINGS (Document No. 12)
November 20, 2013

NEIMAN, U.S.M.J

        This action arises out of a related case in which a class of individuals ("underlying

plaintiffs") obtained judgment against John Puccio and Richard Puccio and related

corporate entities ("underlying defendants") for violations of the Credit Repair

Organizations Act ("CROA"), 15 U.S.C. §§ 1679 *et seq.,* and M.G.L. c. 93A.  *See*

*Zimmermann v. Cambridge Credit Counseling Corp et al.*, Civil Action No. 03-30261-

MAP ("*Zimmermann* action").  The related corporate entities were Cambridge Credit

Counseling Corp., Cambridge/Brighton Budget Planning Corp., Brighton Credit

Management Corp., Brighton Credit Management Corp., Debt Relief Clearinghouse,

Ltd., Cambridge Credit Corp., Cypress Advertising and Promotion, Inc., Brighton Credit

Corp., Brighton Debt Management Services, Ltd., Brighton Credit Corp. of

Massachusetts, and First Consumers Credit Management Corp.  Thereafter, District

Judge Michael A. Ponsor appointed Robb Evans and Associates LLC ("Plaintiff") as

Receiver over the related corporate entities and the assets of the Puccios for purposes

of marshaling and distributing funds to the underlying plaintiffs.  In the case at bar,

Plaintiff seeks to recover a refund of income taxes pursuant to the "claim of right"

doctrine and 26 U.S.C. § 1341 for taxes paid by the underlying defendants on income

which they are obligated to repay to the underlying plaintiffs.

   The United States of America ("Defendant") has filed a motion to dismiss and/or

for judgment on the pleadings.  The motion has been referred to this court for a report

and recommendation.  *See* 28 U.S.C. § 636(b)(1)(B).  For the following reasons, the

court will recommend that Defendant's motion be granted in part and denied in part.

## I. Standard of review

Because Defendant filed the instant motion after filing its answer to Plaintiff's

complaint, the court will treat it as a motion for judgment on the pleadings.  *See Patrick*

*v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013).  "This conversion does not affect [the

court's] analysis inasmuch as the two motions are ordinarily accorded much the same

treatment." *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54 (1st Cir. 2006).[1]  As with a motion to dismiss, to survive a motion for judgment on the pleadings a complaint must allege enough facts so that the claim is "plausible on its face," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2009), *i.e.*, the factual content pled should "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "There is, of course, a modest difference between Rule 12(c) and Rule 12(b)(6) motions.  A Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte-Torres*, 445 F.3d at 54-55.

## II. Background and Procedural History

The following facts come from Plaintiff's complaint, attachments thereto, and certain documents related to the underlying *Zimmermann* action.  *See Tran-spec Truck Service, Inc. v. Caterpillar Inc.,* 524 F.3d. 315, 321 (1st. Cir. 2008) ("When . . . a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged) that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).") (quoting *Beddal v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998)); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) (courts may also consider "official public records" at the motion to dismiss stage).

In November of 2003, the underlying plaintiffs brought a class action suit asserting violations of the CROA and M.G.L. c. 93A in connection with various "credit

---

[1] Accordingly, to the extent Plaintiff argues that Defendant's motion should be denied because it filed an answer before filing the motion, the court disagrees.

counseling" services offered by the underlying defendants.  *See generally Zimmermann*

*v. Cambridge Credit Counseling Corp.*, 529 F.Supp.2d 254 (D.Mass. 2009).  On

January 7, 2008, Judge Ponsor entered summary judgment in favor of the underlying

plaintiffs, holding that the underlying defendants: (1) failed to comply with certain

consumer protection requirements of the CROA, (2) made untrue or misleading

representations and engaged in an attempt to commit fraud or deception in violation of

the CROA, and (3) committed unfair or deceptive acts or practices in violation of

Chapter 93A.  *See id.* at 278-80.  As to the second category of CROA violations, the

court explained,

> Defendants admitted that it was their regular practice to have BC Mass take
> charge of customer [Debt Management Plans] . . . meaning that the
> continued representation that clients would be receiving the services of a
> nonprofit by enrolling with CCCC was an intentional act, one that CCCC must
> have known would deceive any debtors who relied on it.  *See Helms* [*v.*
> *Consumerinfo.com, Inc.*, 436 F.Supp.2d 1220, 1237 (N.D.Ala. 2005)]
> ("Plaintiff may succeed on [a § 16796b(a)(4)] claim, without showing
> individual reliance, . . . if he can show specific intent to defraud.").

*Id.* at 280.

Thereafter, on December 2, 2008, Judge Ponsor entered an order appointing

Plaintiff as Receiver over numerous entities owned or controlled by the Puccios.

(Compl. ¶ 3; *Zimmermann* action, Doc. No. 375.)  That same day, he entered a

judgment against most of these entities in the amount of $259,085,983.00.  (Compl. ¶

4.)  Then, on March 18, 2009, Judge Ponsor entered a judgment against John Puccio

and Richard Puccio as individuals in the amount of $256,527,000.00.  (Id. ¶ 5.)[2]  In the

---

[2] The court also established a "constructive trust over all fees that consumers
paid to the current or former defendant entities."  (*Zimmermann* action, Doc. No. 420 at
6.)

judgment order, Judge Ponsor explained that

> the non-compliance with the [CROA] of the relevant credit repair
> organizations in this case was caused and controlled by John Puccio and
> Richard Puccio and merits an award against them of punitive damages under
> the 15 U.S.C. § 1679g(b) because the noncompliance (1) was frequent and
> persistent; (2) involved false pretenses, the use of false representations and
> amounted to actual fraud; (3) was intentional and/or reckless; and (4)
> because it affected 260,267 class members.

(*Zimmermann* action, Doc. No. 420 at 1-2.)  Judge Ponsor entered another order on

April 15, 2009, appointing Plaintiff as Receiver over all the assets of John Puccio and

Richard Puccio, with the exception of certain limited personal assets and future

earnings.  (Compl. ¶ 6; *Zimmermann* action, Doc. No. 432 at 6.)

    Both receivership orders give Plaintiff the full power of an equity receiver to

supervise, manage, control, operate, and liquidate all receivership property and to bring

such legal actions as it deems necessary or appropriate in discharging its duties as

Receiver relating to locating, marshaling, and managing receivership property.  (Compl.

¶ 7; *Zimmermann* action, Doc. Nos. 375, 432.)   In addition, the receivership orders

authorized Plaintiff to open one or more bank accounts known as qualified settlement

funds ("QSF"), *see* 26 C.F.R. § 1.468B-1, designed to receive and hold the monetary

assets of the Receivership.  (*Zimmermann* action, Doc. Nos. 375 at 10, 432 at 12.)  As

of July 19, 2012, Plaintiff has collected $2,437,850.71 from the underlying defendants in

partial satisfaction of the judgments entered.  (Compl. ¶ 8.)

    On or about April 29, 2011, Plaintiff sought a tax refund from the Internal

Revenue Service ("IRS") on behalf of the receivership estate, filing two IRS 1120-SF

Forms, U.S. Income Tax Return for Settlement Funds.  (Id. ¶ 24.)  The first 1120-SF

Form was for that portion of calendar year 2008 in which the receivership was in effect –

December 2, 2008 to December 31, 2008 – and did not claim any refund.  (Exhibit 1

(attached to Compl.).)  The second 1120-SF Form was for all of calendar year 2009 and

claimed a refund of $9,387,235.  (Id.)  In the "Additional Information" section of this 2009

form, Plaintiff listed $446,786 as having been transferred to the QSF and $36,395 as

having been distributed to claimants during 2009.[3]  (Id.)

In an attachment to the 2009 form, Plaintiff set forth the methodology for its

refund claim.  (Id.)  Plaintiff explained that it has the right to any tax refund the

underlying defendants could claim and that, pursuant to 26 U.S.C. § 1341, it was

entitled to a "claim of right" refund because the underlying defendants paid taxes "on

income that was later determined not to be income."  (Id.)  Plaintiff arrived at the

$9,387,235 figure by referencing the taxes paid by the underlying defendants from 2001

to 2005 and explaining that, as accrual-basis taxpayers, the underlying defendants

would have a right to deduct based on the obligation to repay the income from those

years.[4]  (Id.)  Plaintiff also attached to the 2009 form, among other documents, the

receivership orders from the *Zimmermann* action and IRS 2848 Forms, Power of

Attorney and Declaration of Representative, authorizing Plaintiff to act on behalf of all

the underlying defendants.  (Exhibit 2 (attached to Defendant's Motion to Dismiss).)  On

---

[3] The 2008 form listed $574,839 as having been transferred to the QSF and $0 as having been distributed to claimants during 2008.  (Id.)

[4] Plaintiff included a note at the bottom of its analysis explaining that its calculation "only considers tax years 2001 through 2005," that "[t]he applicable years of this deduction calculation go as far back as 1996 and also include 2006," but that "[t]ax returns were not available for years prior to 2001 or years after 2005."  Plaintiff then stated that it was "in the process of trying to recover such returns" and that it "reserves the right to amend its calculation when such information becomes available."  (Id.)

6

both the 2008 and 2009 tax return forms, "Cambridge Credit Corp Receivership QSF" is

listed as the "name of the fund" and Plaintiff, "Robb Evans & Associates, LLC," is listed

as the name of the administrator.  (Exhibit 1 (attached to Compl.).)

On or about June 27, 2011, the IRS denied Plaintiff's claim for a refund owed to

the receivership estate.  (Id. ¶ 26.)  In the letter denying the claim, the IRS stated that,

"[w]hile the receiver can claim any tax refunds to which the receivership defendants are

entitled, the receiver does not have the right to the tax attributes of the receivership

defendants."  (Exhibit 2 (attached to Compl.).)  The letter continued:

> The receivership defendants could potentially file claims for refund based on
> the claim of right, but they would [not] be entitled to the refunds because they
> are not entitled to benefit from their own fraud.  Since the receivership
> defendants have no rights to refund based on IRC 1341, the receivership
> estate cannot obtain tax refunds.

(Id.)  On July 19, 2012, Plaintiff commenced this action by filing a complaint seeking the

tax refund sought by its administrative claim.

III. DISCUSSION

A. Claim of Right Doctrine

Before addressing Defendant's arguments in support of its motion, a brief

explanation of the "claim of right" doctrine is in order.  Under that doctrine, which

originated in *North Am. Oil Consol. v. Burnet*, 286 U.S. 417, 424 (1932), if a taxpayer

receives income under a "claim of right and without restriction as to its disposition," the

taxpayer must report that amount on his tax return in the year it was received.  If it is

later determined that the taxpayer cannot retain the income, however, he can claim a

deduction in the year of repayment, thereby saving on taxes for that year.  *Id.*[5]

Problematically, "[t]his system had the potential to create inequities because a taxpayer might be forced to pay taxes on the item of income at a certain tax rate and take a deduction at a lower rater (because of an intervening change either in the taxpayer's tax bracket or in the tax rates themselves)."  *Alcoa, Inc. v. United States*, 509 F.3d 173, 176 (3rd Cir. 2007).  Because of this potential inequity, Congress had passed 26 U.S.C. § 1341, which "permits taxpayers in this situation who meet certain requirements 'to recompute their taxes for the year of receipt' if they choose to do so."  *Dominion Resources, Inc. v. United States*, 219 F.3d 359, 363 (4th Cir. 2000) (quoting *United States v. Skelly Oil Co.*, 394 U.S. 678, 682 (1969)).  Section 1341 provides in relevant part:

> (a) General rule.  If –
> (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;
> (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and
> (3) the amount of such deduction exceeds $3,000,
> then the tax imposed by this chapter for the taxable year shall be the lesser of the following:
> (4) the tax for the taxable year computed with such deduction; or
> (5) an amount equal to –
> (A) the tax for the taxable year computed without such deduction, minus
> (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

---

[5] As discussed below, there is some question as to whether a taxpayer in the circumstances presented in this case may claim a deduction only when repayment is made or whether a taxpayer is entitled to a deduction when it is established that he or she is *obligated* to make a repayment.

In effect, "§ 1341 is designed to put the taxpayer in essentially the same position he would have been in had he never received the returned income."  *Dominion Resources, Inc.*, 219 F.3d at 363.

B.  Sovereign Immunity and Standing

In support of its motion, Defendant argues that Plaintiff may not seek a refund here because there has been no waiver of sovereign immunity by Congress except as to claims brought by the original taxpayers, *i.e.*, the underlying defendants.  According to Defendant, because Plaintiff itself did not pay the taxes on income for which it now seeks a refund – rather, the underlying defendants did – the United States is immune from suit and, furthermore, Plaintiff lacks standing.  In support, Defendant cites four provisions of the Internal Revenue Code: (1) 26 U.S.C. § 7422(a), which requires a party to file an administrative claim with the IRS before bringing a refund action; (2) 26 U.S.C. § 6511, which requires that an administrative refund claim be timely filed by the "taxpayer"; (3) 26 U.S.C. § 7701(a)(14), which defines a "taxpayer" as "any person subject to any internal revenue tax"; and (4) 26 U.S.C. § 6402(a), which authorizes the IRS to refund "the person who made the overpayment."  Defendant contends that these provisions, read together, operate to bar Plaintiff, as a third party, from seeking a refund of taxes which the underlying defendants, the "taxpayers," paid.

Plaintiff responds by arguing that yet another statutory provision, 28 U.S.C. § 1346(a)(1), provides the requisite waiver, as explained in *United States v. Williams*, 514 U.S. 527 (1995) and *Brodey v. United States*, 788 F.Supp. 44 (D.Mass. 1991).  Section 1346(a)(1) provides the district courts with jurisdiction over

[a]ny civil action against the United States for the recovery of any internal-

9

revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

28 U.S.C. § 1346(a)(1).  As to Defendant's standing argument, Plaintiff asserts that as a receiver, it steps into the shoes of the underlying defendants and, therefore, has standing to assert any claims they possess.

The court agrees with Plaintiff.  It is clear that section 1346(a)(1), which "uses broad language," waives the Unites States' sovereign immunity for tax refund suits. *Williams*, 514 U.S. at 531.  Of course, it is also clear that this waiver is conditioned on the timely filing of an administrative refund claim, as required by 26 U.S.C. §§ 6511 and 7422(a).  *Id.* at 534 n.7; *United States v. Dalm*, 494 U.S. 596, 602 (1990); *Maine Medical Center v. United States*, 675 F.3d 110, 114 (1st Cir. 2012).  As to Defendant's assertion that sovereign immunity has not been waived for suits pursued by individuals other than the original "taxpayer," the Supreme Court explicitly rejected this argument in *Williams*.  The Court explained that the "plain terms [of § 6511(a)] provide only a deadline for filing for administrative relief, *not a limit on who may file*."  *Williams*, 514 U.S. at 534 (emphasis added).  Because Plaintiff here satisfied the jurisdictional prerequisite of filing an administrative claim, Defendant's sovereign immunity argument fails.

To be sure, Defendant contends that this case is distinguishable from *Williams* and, for that matter, *Brodey*, because the plaintiffs there, while not assessed the taxes at issue, actually paid the taxes.  *See Williams*, 514 U.S. at 530, 535; *Brodey*, 788 F.Supp. at 45, 46.  In *Williams*, the plaintiff was the ex-wife of an individual whose tax

10

liabilities led the United States to place a lien on a portion of their jointly owned house; in *Brodey*, the plaintiff was a shareholder of a corporation which failed to pay certain taxes for which the plaintiff believed she was liable.  Defendant ignores the fact, however, that Plaintiff in the instant matter has asserted the tax refund claim *on behalf of* the underlying defendants who did in fact pay the taxes.  As a receiver, Plaintiff has stepped into the shoes of the underlying defendants in asserting their legal claims and, therefore, stands equal to the taxpayers in both *Williams* and *Brodey*.  *See Miller v. Harding*, 2000 WL 1792990, at *2 (1st Cir. 2000) (unpublished) ("An equity receiver, like a bankruptcy trustee, has standing for all claims that would belong to the entity in receivership . . . .").  Indeed, the Supreme Court in *Williams* went out of its way to recognize just such an approach:

> [a]lthough parties generally may not challenge the tax liabilities of others, this rule is not unyielding.  A taxpayer's fiduciary may litigate the taxpayer's liability, even though the fiduciary is not herself liable.  *See* 26 C.F.R. § 301.6903-1(a) (1994) (the fiduciary must 'assume the powers, rights, duties, and privileges of the taxpayer with respect to the taxes imposed by the Code') . . . .

*Williams*, 514 U.S. at 539; *see also* 26 U.S.C. § 7701(a)(6) (defining "fiduciary" as including a "receiver").  Here, therefore, Plaintiff is not merely a third party seeking to benefit from another's claims.  Rather, Plaintiff is a court-appointed, and congressionally authorized, equity receiver.  *See* 28 U.S.C. § 754.  Accordingly, because Plaintiff stepped into the underlying defendants' shoes, the fact that it itself did not pay the taxes on which it seeks a refund does not bar this action.  *Cf.* IRS Chief Counsel Advisory 201222001, 2012 WL 1961411 (Feb. 2012) ("In certain contexts, a taxpayer that succeeds to the interest of another taxpayer is treated as effectively stepping into the

shoes of the other taxpayer.").

Persevering, Defendant nonetheless argues that Plaintiff does not possess the "tax attributes" of the underlying defendants because, unlike analogous contexts such as bankruptcy, a deceased taxpayer, or successor corporations, there is no statute granting Plaintiff the right to succeed to the underlying defendants' claims.  The court disagrees.  As identified by the Supreme Court in *Williams*, there are specific statutory provisions requiring a fiduciary to "assume the powers, rights, duties, and privileges of" the underlying taxpayer with respect to taxes imposed by the Internal Revenue Code. 26 U.S.C. § 6903(a); 26 C.F.R. § 301.6903-1(a).  In addition, similar to a receiver, there are no specific provisions authorizing a bankruptcy estate, the estate of a deceased taxpayer, or successor corporations to bring a section 1341 claim on behalf of the predecessor entity, yet courts and the IRS still permit such claims.  *See Cooper v. United States*, 362 F.Supp.2d 649, 652-53 (W.D.N.C. 2005) (rejecting the Government's argument that, because 26 U.S.C. § 1398(g) -- which provides a specific list of tax attributes that pass from the debtor to the bankruptcy estate -- did not include section 1341 claims, the trustee lacked standing); *Good's Estate v. United States*, 208 F.Supp. 521, 523 (E.D.Mich 1962) (rejecting the Government's argument "that, since [26 U.S.C. §] 691(b) does not specifically include a deduction under Section 1341," a deceased taxpayer's estate may not pursue a section 1341 claim); Rev. Rul. 71-496 (acquiring corporation succeeds to the transferor corporation's section 1341 claim pursuant to 26 U.S.C. § 381(c)(16), which does not specifically mention section 1341 claims).  Thus, contrary to Defendant's argument, these analogous contexts provide support for rather than undermine Plaintiff's standing to bring the instant action.

C. <u>Technical Error in Administrative Claim</u>

Defendant posits one further argument challenging Plaintiff's standing.  Even if Plaintiff could make a claim on behalf of the underlying defendants, Defendant asserts, it may not do so here because the administrative refund claim names the QSF, not the Puccios and/or the related entities, as the applicable taxpayer.  The IRS 1120-SF Forms do in fact name the QSF instead of the underlying defendants as the applicable taxpayer on whose behalf Plaintiff is seeking the tax refund.  A QSF, it should be noted, is treated as a separate taxable entity and must itself file an income tax return for each year it is in existence.  *See* 26 C.F.R. § 1.468B-2(a) and (k)(1).  The attachments to Plaintiff's 2009 form, however, make clear that Plaintiff is seeking a refund based on income taxes paid by the underlying defendants.  Plaintiff also attached the receivership orders from the *Zimmermann* action and power of attorney forms authorizing Plaintiff to act on behalf of the underlying defendants.  *See* C.F.R. § 301.6402-2(e) ("A claim may be executed by an agent of the person assessed, but in such case a power of attorney must accompany the claim"); *see also* 26 U.S.C. § 6903(a) (requiring notice "that any person is acting for another person in a fiduciary capacity"); 26 C.F.R. § 301.6903-1(a) (same).  As far as the court is concerned, the mistake, which would be easily remedied, is immaterial.

To be sure, Defendant cites *Browning Ferris Industries, Inc. & Subsidiaries v. United States*, 2007 WL 1412087, at *2 (Fed.Cl. May 10, 2007), for the proposition that "a claim for refund containing an error concerning the identity of the taxpayer stands on the same footing as a claim filed outside the statute of limitations: both are jurisdictionally infirm."  As distinct from the instant matter, however, the plaintiff there did

not mistakenly file the refund claim in a possibly wrong representative capacity.  Rather,

the plaintiff was deemed by the court to no longer exist for federal tax purposes and,

thus, could not seek a refund as the common parent of a consolidated group of

subsidiaries.  *See Browning Ferris Industries, Inc. & Subsidiaries v. United States*, 75

Fed.Cl. 591, 597 (Fed.Cl. 2007), *reversed on other grounds*, 274 Fed.Appx. 904

(Fed.Cir. 2008); *Browning Ferris Industries, Inc.,* 2007 WL 1412087, at *1, 2 (Fed.Cl.

May 10, 2007).

A far more analogous and persuasive case is *Smith v. United States*, 1992 WL

211052 (N.D.Ill. Aug. 26, 1992), where the plaintiff, Sylvania, filed refund claims with the

IRS for an overpayment of income taxes made by her deceased ex-husband George.

*Id.* at *1.  Instead of filing the claims as the legal guardian of their daughter and

George's sole heir, which the IRS indicated would have been proper, Sylvania filed the

claims in her own capacity and as George's surviving spouse.  *Id.* at *1, 3.  This error,

the Government argued, deprived the court of jurisdiction.  *Id.* at *3.  The court held,

however, that because the purposes of the administrative claim requirement -- "to

prevent surprise and to provide the IRS with adequate notice of the nature and extent of

the claims and its underlying facts" – were satisfied, the technical error did not bar the

action.  *Id.*  The court explained that

> the claims for refund filed by Sylvania as the surviving spouse of George
> adequately informed the Commissioner that a representative of a deceased
> taxpayer was making claims relating to assessments made against joint
> returns for the years 1978 and 1979.  Sylvania's refund claims also included
> the precise grounds underlying the request for refunds.

*Id.* at *4.  The court continued: "[b]ecause Sylvania is the proper person to maintain this

action for a refund of taxes paid by her former husband, albeit in a different

14

representative capacity than that advanced in the claims themselves, the Court finds

that the government has not been prejudiced by the technical defect in Sylvania's

claims." *Id.*

Similarly, here, Plaintiff may well have mistakenly filed the refund claim in the

incorrect representative capacity – on behalf of the QSF, instead of the underlying

defendants.  As described, however, the refund claim made clear that Plaintiff was

seeking a refund based on income taxes paid by the underlying defendants.  In addition,

as in *Smith*, the IRS here appears to acknowledge that Plaintiff could file a refund claim

on behalf of the underlying defendants, implying only that Plaintiff failed to include

power-of-attorney forms with the claim.  In fact, Plaintiff did include such forms with the

refund claim, along with the receivership orders.  Moreover, unlike *Smith*, where the IRS

failed to act on the administrative claim, *id.* at *1, the IRS here treated the claim as one

on behalf of the underlying defendants, thus implicating the waiver of its belated

objection.

It is also critical that the IRS did not deny Plaintiff's refund claim based on any

technical error concerning representative capacity.  Rather, the IRS acted on the merits

of the claim, making clear that it understood the claim to be on behalf of the "receivership

defendants," *i.e.*, the underlying defendants in the *Zimmermann* action.  The IRS only

denied the claim, in the first instance, because "the receiver does not have the right to

the tax attributes of the receivership defendants," which argument the court addressed,

and rejected, above.[6]  In cases such as this, where the IRS acts on the merits of the

---

[6] The second basis on which the IRS denied the claim was that the underlying
defendants did not qualify for section 1341 relief because they derived the income

administrative claim despite some technical deficiency, courts have routinely held that the IRS has waived its right to thereafter object to the sufficiency of the administrative claim.  As the Supreme Court explained in *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 297 (1945):  "If the Commissioner chooses not to stand on his own formal or detailed requirements, it would be making an empty abstraction, and not a practical safeguard, of a regulation to allow the Commissioner to invoke technical objections after he has investigated the merits of a claim and taken action upon it."  Accordingly, waiver may be found where "[t]he evidence [is] clear that the Commissioner understood the specific claim that was made even though there was a departure from form in its submission" and "the Commissioner has in fact [s]een fit to dispense with his formal requirements and to examine the merits of the claim."  *Id.* at 297-98; *see also Kikalos v. United States*, 479 F.3d 522, 525 (7th Cir. 2007); *Computervision Corp. v. United States*, 445 F.3d 1355, 1365 (Fed.Cir. 2006); *PALA, Inc. v. United Stated*, 234 F.3d 873, 879 (5th Cir. 2000); *Weisman v. Comm'r of Internal Revenue*, 103 F.Supp.2d 621, 628 n.12 (E.D.N.Y. 2000).

Here, too, waiver is appropriate because the purposes of the administrative claim requirement – to prevent surprise, adequately apprise the IRS of the specific claim, and expedite the fair settlement of claims – have been satisfied.  *See Levitsky v. United States*, 27 Fed.Cl. 235, 240-41 (Fed.Cl. 1992); *see also Computervision Corp.* 445 F.3d at 1363.  As explained by the Federal Circuit, "[t]he central purpose of the waiver

_____

through fraud, and "[s]ince the receivership defendants have no rights to refund based on IRC 1341, the receivership estate cannot obtain tax refunds"; this argument is addressed below.

doctrine is 'to prevent IRS agents from lulling taxpayers into missing the [limitations] deadline.'" *Computervision Corp.*, 445 F.3d at 1366 (quoting *BCS Financial Corp. v. United States*, 118 F.3d 522, 526 (7th Cir. 1997). This purpose is especially relevant here since Defendant contends that an administrative claim curing the deficiency, *i.e.*, naming the underlying defendants instead of the QSF, would not be timely.[7]

In light of the foregoing, the court recommends that the action not be dismissed on the basis of sovereign immunity, standing, or the technical error in the administrative refund claim.

D. Collateral Estoppel

Defendant next argues that collateral estoppel bars Plaintiff from asserting a claim pursuant to 26 U.S.C. § 1341 because the court in the *Zimmermann* action found that the underlying defendants obtained the income through fraud. A taxpayer who obtains income through fraud, Defendant argues, does not qualify for relief under section 1341 and, thus, the underlying defendants would not be entitled to a refund if they had pursued it on their own. Accordingly, Defendant asserts, Plaintiff is similarly precluded from pursuing a refund.

Plaintiff posits three arguments in response. First, Plaintiff argues that the

---

[7] Of course, the informal claim doctrine, as distinct from the waiver doctrine, could potentially alleviate the statute of limitations issue. "The informal claim doctrine allows an insufficient refund claim to be 'treated as adequate where formal defects and lack of specificity have been remedied by amendment filed after the lapse of the statutory period.'" *Kikalos*, 479 F.3d at 526 (quoting *United States v. Kales*, 314 U.S. 186, 194 (1941)). Because the IRS acted on the merits of Plaintiff's administrative claim and treated it as seeking a refund on behalf of the underlying defendants, and thus Plaintiff had no reason to believe its claim was technically deficient until Defendant filed this motion, the court sees no need to require Plaintiff to file another claim with the IRS and rely on the informal claim doctrine.

17

underlying defendants did not believe that they received the income through fraud;

accordingly, relief under section 1341 would have been available to them.  Second, and

relatedly, Plaintiff argues that collateral estoppel does not apply because the issue in the

*Zimmermann* action, *i.e.*, whether the underlying defendants engaged in fraudulent

activity and other CROA violations, is not identical to the issue here, *i.e.*, whether the

underlying defendants had a subjective belief that they were receiving the income

through fraud and, thus, knew at the time that they did not have an unrestricted right to

the income.  Third, relying on *Cooper v. United States*, 362 F.Supp.2d 649 (W.D.N.C.

2005), Plaintiff asserts that the fraudulent acts of the underlying defendants should not

be imputed to Plaintiff since it is the victims of the fraud who would ultimately recover any

refund, not the underlying defendants.[8]

--------

[8] Plaintiff also argues that collateral estoppel, which it labels an "equitable defense," may not be used against an equity receiver.  The court, however, is not persuaded.  First, the court is unable to find a single case in which collateral estoppel was not applied against an equity receiver solely because of its status as "receiver."  In this regard, the cases cited by Plaintiff involve *equitable* estoppel, not collateral estoppel.  *See, e.g.*, *In re Cohn-Phillips, Ltd.*, 193 B.R. 757, 764 n. 10 (Bankr.E.D.Va. 1996) ("Collateral estoppel prevents a party from re-litigating ultimate issues of fact that have been resolved against that party. . . .  In contrast, equitable estoppel prevents a party from inducing a litigant's reliance on a proposition and then subsequently adopting the reverse position to win in another scenario." (internal citations omitted)); Restatement (Second) of Judgments ch. 1, Scope, d (1982) (distinguishing between "estoppel result[ing] from conduct by the party," which is generally not addressed by the restatement, and estoppel based on the preclusive effects of a court judgment, which is within the scope of the restatement).  Second, even assuming Plaintiff is correct that equitable defenses do not normally apply against a federal equity receiver, the court is not convinced that collateral estoppel is an equitable defense.  *See California Dep't of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F.Supp.2d 1028, 1039 (C.D.Cal. 2002) (explaining that courts "have differentiated between defenses such as res judicata and collateral estoppel, on the one hand, and equitable defenses such as unclean hands or waiver on the other," in cases brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), which bars the assertion of equitable defenses to CERCLA liability).

As mentioned, subsection (a)(1) of 26 U.S.C. § 1341 requires, in order for a taxpayer to obtain relief, that an "an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item." Courts have variously construed this requirement of an "unrestricted right" to income, beginning with *McKinney v. United States*, 574 F.2d 1240, 1243 (5th Cir. 1978). The Fifth Circuit explained that, "[w]hen the item was embezzled funds it is clear that it could not appear to the taxpayer that he had any right to the funds, much less 'an unrestricted right' to them." *Id.* In doing so, the Fifth Circuit recognized that illegal income was not taxable when Congress passed section 1341, because there could be no "claim of right" to such income. *See Comm'r of Internal Revenue v. Wilcox*, 327 U.S. 404, 408 (1946). The Supreme Court subsequently reversed course and held that even ill-gotten gains must be reported as income. *See James v. United States*, 366 U.S. 213, 219 (1961). This reversal did not mean that all taxable income was therefore received under an "unrestricted right": as the Fifth Circuit explained, "[i]t could not have been the intent of Congress to give the benefits of this new relief section to holders of embezzled funds." *McKinney*, 574 F.2d at 1243.

Shortly thereafter, at least one court extended *McKinney*'s holding beyond embezzlers "to exclude from [section 1341's] coverage all those who receive earnings knowing themselves to have no legal right thereto." *Perez v. United States*, 553 F.Supp. 558, 561 (M.D.Fla. 1982). And more recently, the Federal Circuit held that "[w]hen a taxpayer knowingly obtains funds as the result of fraudulent action, it simply cannot appear from the facts known to him at the time that he has a legitimate, unrestricted claim to the money." *Culley v. United States*, 222 F.3d 1331, 1335 (Fed.Cir. 2000). The

19

Federal Circuit explained:

> [w]hen committing an intentional wrong, a taxpayer must be prepared for the
> eventuality of being discovered and being held liable for repayment in the
> form of restitution, disgorgement, civil or criminal penalties, or the like. . . .
> A taxpayer's illicit hope that his intentional wrongdoing will go undetected
> cannot create the appearance of an unrestricted right.

*Id.* at 1336 (internal citation omitted).

In light of these holdings, which the court finds persuasive, several things become

clear.  First, the findings in the underlying *Zimmermann* action would preclude relief

under section 1341 if sought by the underlying defendants on their own behalf.  Judge

Ponsor explicitly held that the underlying defendants intended to defraud the underlying

plaintiffs in violation of the CROA by falsely representing "that clients would be receiving

the services of a nonprofit."  *Zimmermann*, 529 F.Supp.2d at 280.  He also held that this

false representation "could reasonably sway a consumer in the decision whether to

retain a company, especially in the perilous world of credit services, and appears to have

done so in the case of [the underlying plaintiffs]."  *Id.* at 279.  Later on, Judge Ponsor

held that punitive damages were appropriate because the underlying defendants' CROA

violations, "caused and controlled by John Puccio and Richard Puccio," were "frequent

and persistent," "amounted to actual fraud," and were "intentional and/or reckless."

(*Zimmermann* action, Doc. No. 420 at 1-2.)  Thus, contrary to Plaintiff's assertions, it is

established for present purposes that the underlying defendants knowingly obtained the

income through fraud.

Second, the remaining collateral estoppel requirements have been met, a

conclusion not really disputed by Plaintiff.  Collateral estoppel, or issue preclusion, "may

be applied where '(1) the issue sought to be precluded in the later action is the same as

that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgement; and (4) the determination of the issue was essential to the judgment.'" *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 770 (1st Cir. 2010) (quoting *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007)).[9]  In addition, in a case involving non-mutual defensive collateral estoppel, as here, the plaintiff must be one of the parties, or in privity with a party, from the first action.  *See Acevedo-Garcia*, 351 F.3d at 574; *N.L.R.B. v. Donna-Lee Sportswear Co., Inc.*, 836 F.2d 31, 34 (1st Cir. 1987).  On this point, the court agrees with Defendant that Plaintiff is in privity with the underlying defendants for collateral estoppel purposes since, as discussed, it stands in their shoes.  *See Donna Lee Sportswear Co., Inc.*, 836 F.2d at 34-35 ("[T]he privity which can lead to issue preclusion is that relationship between two parties which is sufficiently close so as to bind them both to an initial determination, at which only one of them was present.")

Third, the fraud of the underlying defendants should not be imputed to Plaintiff as the court-appointed receiver, leaving it free to pursue relief under section 1341, as occurred in *Cooper*, 362 F.Supp.2d 649.  The plaintiff there, a bankruptcy trustee, sought a tax refund pursuant to section 1341 for the bankruptcy estate of a debtor who obtained income through fraud but repaid a portion of the income to the bankruptcy estate for the benefit of the defrauded creditors.  *Id.* at 651-52.  The court first reiterated its earlier ruling that the plaintiff had standing to assert the refund claim on behalf of the debtor "regardless of § 1341's absence from IRC § 1398, which lists the tax attributes to which

---

[9] Whether collateral estoppel applies in this case is a question of federal common law.  *See Ramallo Bros. Printing Inc.*, 490 F.3d at 89.

a bankruptcy estate succeeds." *Id.* at 652-53.  The court then explained that, "if the

debtor in this case were the plaintiff seeking a refund, the I.R.S.'s denial of refund

computation under § 1341 likely is warranted" in light of the debtor's fraud in obtaining

the income.  *Id.* at 656.  Given the fact that the debtor was not the plaintiff in that action,

however, the court carefully considered, and rejected, the imputation of the fraud to the

bankruptcy trustee: "[i]mputing the bad acts of the debtor onto the bankruptcy trustee in

the present case renders a categorically inequitable result, that is, the innocent

victimized creditors get nothing, and the government gets a windfall.  Consequently," the

court found

> the government is estopped from asserting fraud in an effort to avoid
> refunding an overpayment of taxes, when such "defense" works to deprive
> the very *victims* of the fraud from recovering what is essentially and rightfully
> their's.  Such a deprivation does not further the purpose of the fraud
> exception to § 1341 recovery, which seeks to disallow a wrongdoer from
> reaping a benefit from such wrongdoing.  Here, the culprit has been
> removed, and only the creditors, not the wrongdoer, benefit.  As such,
> evidence of the debtor's fraudulent acts are wholly incidental, because the
> debtor is not the plaintiff.  When the fraudulent actor is taken out of the
> equation, the purpose of § 1341, an equitable relief provision, is served by
> awarding the Trustee a refund, not vice versa.

*Id.* at 656 (emphasis in original).

As would be expected, Defendant here takes issue with *Cooper*, arguing that its

reasoning improperly treats the fraud exception to section 1341 relief as an *in pari delicto*

equitable defense.  Indeed, the *Cooper* court stated that section 1341's fraud exception

"is derived from the defense of *in pari delicto* which stands for the proposition that one

who participates in wrongdoing cannot later recover damages as a result of wrongdoing."

*Id.* at 655 n. 3.  The court also cited *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995),

which explained that "the defense of *in pari delicto* loses its sting when the person who is

*in pari delicto* is eliminated," *id.* at 754.  According to Defendant, however, the section 1341 fraud exception is based not on an equitable argument but on the *statutory* requirement that a taxpayer must have had an "unrestricted right" to the income in order to seek the tax refund; as such, Defendant asserts, a court may not refuse to impute the original taxpayer's fraud to a bankruptcy trustee or receiver.

In the court's view, Defendant is correct at least in part; the defense of *in pari delicto* is not directly at issue here and ought not be controlling.  Despite this, however, as well as other potential flaws in *Cooper* identified below, the premise underlying the non-imputation of wrongdoing is readily applicable to the present case.  That is, the bad acts of the underlying entities in a receivership should not be imputed to a receiver seeking benefits for victims.  Thus, the *in pari delicto* defense aside, the result is the same when interpreting the applicable statutory requirments: the underlying defendants' fraud here should not extend to Plaintiff, the receiver, so as to defeat recovery.  The court reasons as follows.

"Although a receiver generally has no greater powers than the corporation had as of the date of the receivership, it is well established that when the receiver acts to protect innocent creditors . . . he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so."  *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012) (internal quotation marks omitted); *see also S.E.C. v. Cook*, 2001 WL 256172, at *2 (N.D.Tex. March 8, 2001) ("[W]hile the general rule is that the receiver may only bring actions that could have been brought by the entity in receivership, there are certain situations where the receiver is permitted to assert rights and defenses not available to the insolvent.") (internal quotation marks

omitted).  As the Ninth Circuit had explained,

> [w]hile a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law.  Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall.  This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors.

*F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995).  Consideration of the innocent victims' interests is particularly appropriate where, as here, the district court appointed and supervises the receiver pursuant to its broad equitable powers.  *Cf. New York Community Bank v. Sherman Ave. Associates, LLC*, 786 F.Supp. 2d 171, 175 (D.D.C. 2011); *F.D.I.C. v. Bernstein*, 786 F.Supp. 170, 177 (E.D.N.Y. 1992).

If anything, Plaintiff has a stronger argument for relief under section 1341 as a federal equity receiver than did the bankruptcy trustee in *Cooper*.  When a bankruptcy trustee asserts a debtor's legal rights pursuant to 11 U.S.C. § 541, as occurred in *Cooper*, courts have more often held that the trustee is limited to the rights held by the debtor as of the commencement of the bankruptcy case.[10]  *See Nisselson v. Lernout*, 469 F.3d 143, 153 (1st Cir. 2006); *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006); *Grassmueck v. American Shorthorn Ass'n*, 402 F.3d 833, 836 (8th Cir. 2005); *Official Comm. Of Unsecured*

---

[10] The court in *Cooper* cited *In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 246 (3d Cir. 2003), in support of its non-imputation holding, but that case applied 11 U.S.C. § 548, which permits trustees to avoid certain fraudulent transfers.  The Third Circuit actually explained in the decision that if the action had been brought under § 541 imputation *would* be required.  *See id.* at 246 ("We therefore agree with the Trustee that *Lafferty* does not extend to the situation at bar because the Trustee is acting under § 548 rather than § 541.").

*Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356-57 (3d Cir. 2001); *In re Hedged-Investments Associates, Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996).  This limitation is mandated by the language of section 541(a)(1), which provides that the property of the bankruptcy estate is comprised of "all legal and equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  As the Tenth Circuit explained, this language "establishes the estate's rights as no stronger than they were when actually held by the debtor."  *In re Hedged-Investments Associates, Inc.*, 84 F.3d at 1285; *see also R.F. Lafferty & Co.*, 267 F.3d at 357 ("The plain language of section 541, however, prevents courts from taking into account events that occur after the commencement of the bankruptcy case.  As a result, we must evaluate the *in pari delicto* defense without regard to whether the Committee is an innocent successor.").

This limitation, however, does not necessarily apply to receivers.  *See R.F. Lafferty & Co.*, 267 F.3d at 358 ("[U]nlike bankruptcy trustees, receivers are not subject to the limits of section 541."); *In re Hedged-Investments Associates, Inc.*, 84 F.3d at 1285 ("[B]ankruptcy law, apparently unlike the law of receivership, expressly prohibits the result [the trustee] urges.").  Thus, unlike a bankruptcy trustee acting pursuant to section 541, nothing requires a court to impute the fraud of the underlying defendants to Plaintiff as the court-appointed receiver.  *Compare In re Personal and Business Ins. Agency*, 334 F.3d 239, 247 (3d Cir. 2003) ("[N]othing in the language of § 548 precludes us from considering the replacement of Kesselring by the Trustee and the concomitant removal of the taint of Kesselring's fraud from PBI, and we hold that Kesselring's conduct will not be imputed to the Trustee.").  If fact, the receivership statutes and section 1341 are silent on the issue of imputation, as are Judge Ponsor's receivership orders.  Just as the Fifth

Circuit believed that "[i]t could not have been the intent of Congress to give the benefits

of this new relief section [*i.e.*, 26 U.S.C. § 1341] to holders of embezzled funds,"

*McKinney*, 574 F.2d at 1243, this court believes that Congress could not have intended

to bar relief in the instant situation where the underlying victims, rather than the

wrongdoers, stand to benefit.  After all, section 1341 is a relief provision "enacted to

alleviate . . . inequities," *Skelly Oil Co.*, 394 U.S. at 681.  *See Penzoil-Quaker State Co.*

*& Subsidiaries v. United States*, 62 Fed.Cl. 689, 697 (Fed.Cl. 2004) ("[A]s a remedial

statute, § 1341 should be interpreted broadly to effectuate congressional goals" and "any

doubts regarding the plain meaning of the statute must be resolved against the

government and in favor of the taxpayer.").

Absent the imputation of the fraud to the receiver, the "unrestricted right"

requirement is satisfied for purposes of a receiver's refund action.  Thus, here, Plaintiff is

not tainted by the underlying defendants' fraud and, therefore, is not precluded from

pursuing the instant claim.  Accordingly, the court recommends that the action not be

dismissed on the basis of collateral estoppel.

E.  Restoration Requirement

As a final matter, Defendant argues that, even if Plaintiff can maintain a claim

under section 1341, it is only entitled to relief based on the $446,786 transferred into the

QSF in 2009.  According to Defendant, because the top income tax rate from 2001 to

2005 was 39.1%, Plaintiff's recovery is limited to no more than $174,693.33.  Plaintiff

responds by arguing that this issue is not properly before the court at this time.  Even so,

Plaintiff also argues that it is entitled to a refund based on the underlying defendants'

*obligation* to repay the income, apparently relying on their status as accrual-basis

taxpayers.

As an initial matter, the court finds unpersuasive Plaintiff's argument that the court should refrain from addressing this particular issue. While certain facts are not available at this time, the court believes it is entirely appropriate to resolve the *legal* dispute as to whether or not Plaintiff's tax refunds from Defendant would be limited to an amount commensurate with the actual restoration of income on which taxes previously were paid. *See, e.g.*, *Barr Inc. v. Town of Falmouth*, 488 F.Supp.2d 5, 8 (D.Mass. 2007) (addressing at the motion to dismiss stage whether the plaintiff's damages were limited to bid preparation costs). The court concludes that the refund are limited in just that way.

As Defendant points out, the title of section 1341, "Computation of Tax Where Taxpayer Restores Substantial Amount Held Under Claim of Right," at least suggests that restoration of income is required before a tax refund is available. And although the body of the statute contains no comparable language, Defendant's argument finds support in the case law. *See Chernin v. United States*, 149 F.3d 805, 816 (8th Cir. 1998) ("We therefore conclude that under section 1341(a)(2), funds must actually be repaid to establish the unrestricted right to those funds has been lost."); *Reynolds Metals Co. v. United States*, 389 F.Supp.2d 692, 702 (E.D.Va. 2005) (relying on *Chernin* and holding that the plaintiff is not entitled to a deduction under section 1341(a)(2) because the plaintiff "has only demonstrated its obligation to pay for the remediation; it has not demonstrated restoration of an item of income to an entity from whom the income was receiver or to whom the item of income should have been paid"); *Schmidt v. Comm'r of Internal Revenue*, 86 T.C.M. (CCH) 631, 2003 WL 22790862, at *10 (2003) ("Section 1341, however, requires actual repayment, restoration, or restitution."). *But see Skelly*

27

*Oil Co.*, 394 U.S. at 682 n.2 ("In the case of an accrual-basis taxpayer, the legislative history makes it clear that the deduction [under section 1341(a)(2)] is allowable at the proper time for accrual."); *In re Southwestern States Marketing Corp*, 1996 WL 166876, at *2 (5th Cir. March 4, 1996) (unpublished) ("Under the accrual method of accounting, a liability is incurred and generally is taken into account for tax purposes in the calendar year in which 'all events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability.') (quoting 26 C.F.R. § 1.461-1(a)(2)).

Even assuming that section 1341 itself does not mandate restoration, it does require that the deduction be "allowable."  *See* 26 U.S.C. § 1341(a)(2).  Accordingly, the court must look to other provisions of the tax code to determine if a particular deduction is permitted.  *See Skelly Oil Co.*, 394 U.S. at 683 (the "deduction [under section 1341(a)(2)] must be determined . . . by reference to the applicable sections of the Code and the case law developed under those sections"); *see also Florida Progress Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 348 F.3d 954, 958 (11th Cir. 2003) (Section 1341(a)(2) "itself does not indicate whether a deduction should be allowable.  That answer must be found in another provision of the code.").  Having done so, the court concludes that other provisions of the tax code do require restoration as a prerequisite to a deduction.

Under 26 U.S.C. § 461, which sets forth the general deduction rules, "economic performance" must occur before a liability may be deducted.  26 U.S.C. § 461(h).  And under applicable regulations, "[i]f the liability of a taxpayer requires a payment or series of payments to another person and arises under any workers compensation act or out of

28

any tort, breach of contract, *or violation of law*, economic performance occurs as payment is made to the person to which the liability is owed." 26 C.F.R. § 1.461-4(g)(2) (emphasis added).  For payments made to a QSF, however, a deduction is permitted at the time of payment into the fund, rather than at the time of distribution to the claimants. *See* 26 C.F.R. § 1.468B-3(c)(1) ("[F]or purposes of section 461(h), economic performance occurs with respect to liability described in § 1.468B-1(c)(2) . . . to the extent the transferor makes a transfer to a qualified settlement fund to resolve or satisfy liability."); *see also United States v. Brown*, 348 F.3d 1200, 1216 (10th Cir. 2003) (explaining that Congress, under 26 U.S.C. § 468B(g), constitutionally delegated the authority to issue the QSF regulations).  Accordingly, the court believes, Plaintiff is only entitled to recover based on amounts that have actually been transferred to the QSF.[11]

Defendant asks the court to go one step further and rule that Plaintiff is entitled to no more than $174,693.33.  As mentioned, Defendant calculates this figure using the top income tax rate from 2001 to 2005 of 39.1% and the $446,786 transferred into the QSF

---

[11] It is unclear from the pleadings whether all of the underlying defendants are accrual-basis taxpayers.  Looking at the facts in the light most favorable to Plaintiff, therefore, the court will assume that all of the underlying defendants, including John Puccio and Richard Puccio, are accrual-basis taxpayers, despite Defendant's assertions to the contrary.  The court notes, however, that if some of the underlying defendants are cash-basis, rather than accrual-basis, taxpayers, it is unclear whether a deduction is permitted upon the transfer of funds to the QSF or only upon repayment to the underlying plaintiffs.  *Compare* Gregory L. Germain, *Avoiding Phantom Income in Bankruptcy: A Proposal for Reform*, 5 FLA. TAX. REV. 249, 278 (2001) (concluding that "no deduction would be available for a cash method taxpayer's payments to a QSF, because under the cash method no deduction is allowed for fund payments unless the taxpayer's underlying liability to the creditor is discharged as a result of the transfer"), *with* Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement, SAICD §23.06 at n.66 (Aspen Publishers 2013) ("Payments to designated settlement fund or qualified settlement fund probably also constitute 'payments' sufficient to trigger deductions under the cash method of accounting.").

in 2009.  The court, however, does not believe that it has enough information at this time

to make such a definitive calculation.   For example, it is unclear in what year the

restored income was obtained, by which taxpayer, and the applicable tax rate in that

year.  At some point, these issues need to be fleshed out further by the court, if not the

parties.  For the moment, therefore, the court only recommends that Defendant's motion

be granted to the extent it seeks to limit Plaintiff's damages based on amounts that have

been transferred to the QSF without reference to any definitive calculation.

IV.  CONCLUSION

For the reasons stated, the court recommends that Defendant's motion be

granted in part, to the extent it seeks to limit Plaintiff's damages in the manner described

above, and denied to the extent it seeks dismissal of the action.[12]


 /s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

[12] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or
Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations
must file a written objection with the Clerk of this Court **within fourteen (14) days** of the
party's receipt of this Report and Recommendation.  The written objection must
specifically identify the portion of the proposed findings or recommendations to which
objection is made and the basis for such objection.  The parties are further advised that
failure to comply with this rule shall preclude further appellate review by the Court of
Appeals of the District Court order entered pursuant to this Report and
Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275
(1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v.
Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-
79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.
1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to
another party's objections within fourteen (14) days after being served with a copy
thereof.